## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### (Civil Division)

_____

| | |
|---|---|
| **TIFFANY WASHINGTON**<br>**22591 Lost Creek Terrace, Unit 302**<br>**Ashburn, VA 20148**<br><br>      **Plaintiff**<br><br>**v.**<br><br>**WASHINGTON METROPOLITAN**<br>**AREA TRANSIT AUTHORITY**<br><br>      **Defendant** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Civil Action No.**_____

**Jury Requested**

_____

### COMPLAINT

**COMES NOW** Plaintiff, Tiffany Washington (hereinafter "Plaintiff" or "Ms. Washington"), by and through his undersigned counsel, and sues Washington Metropolitan Area Transit Authority (hereinafter "WMATA" or "Defendant"), and for cause of action states as follows:

### NATURE OF THE CASE

1.      Plaintiff brings this civil action pursuant to Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, the District of the Columbia Human Rights Act of 1977, and the Americans With Disabilities Amendment Act of 1990 for relief from discrimination,.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §1331, as it asserts a claim that arises under laws of the United States, specifically Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*, the District of Columbia Human Rights Act of 1977, and the Americans With Disabilities Amendment Act of 1990.

3.      Venue is appropriate and is based on the fact that a substantial part of the actions complained of are the result of actions and the employment practices of Defendant, a municipality within Washington, D.C. *Id.*

## EXHAUSTION OF REMEDIES

4.      Plaintiff timely contacted the United States Equal Employment Opportunity Commission ("EEOC") and filed a complaint against WMATA, (identified as EEOC Charge No.570-2019-00065), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §2000e, *et. seq.*, and the District of the Columbia Human Rights Act of 1977, and the Americans With Disabilities Amendment Act of 1990.

5.      Plaintiff has exhausted all of her administrative remedies.

6.      Plaintiff submitted a Form 5 Charge to the EEOC alleging that WMATA had violated Title VII of the Civil Rights Act of 1964, as amended, and the Rehabilitation Act of 1973 due to discrimination based upon her race, sex, retaliation and disability.

7.      On August 2, 2019, Plaintiff received a Dismissal and Notice of Rights letter from the Equal Employment Opportunity Commission stating that Plaintiff had ninety (90) days to file suit, if she so desired.

8.      On October 31, 2019, Plaintiff timely filed her action within ninety (90) days of receipt of the EEOC's "Notice of Right to Sue."

## PARTIES

9.      Plaintiff is currently domiciled at 22581 Lost Creek Terrace, Unit 302 Ashburn, VA 20148.  Plaintiff is a resident of the State of Maryland and a United States citizen.

10.      Defendant WMATA is an instrumentality created by Congress to operate a mass

transit system in the state of Maryland and the District of Columbia and the surrounding Metropolitan area and is subject to suit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of its employees or agents and is therefore liable, pursuant to the doctrine of *Respondeat Superior*.

## FACTUAL BACKGROUND

11.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

12.     Plaintiff was hired by Defendant on September 24, 2001 as a Police Officer, and during the time at issue she was assigned to District 2 Midnights from January 2016 through September 2016 and then to District 2 Day Work from September 2016 through her termination on April 5, 2019.

13.     When she was on Midnights, at all times relevant, Ronald Pavlik was the Chief of Police.

14.     During her employment she was regularly engaged in EEO activity starting in 2016 through her termination on April 5, 2019.

### Sexual Harassment

15.     During the course of her employment, starting in or about February 2016 through May 2016, Ms. Washington was subjected to sexual harassment by her coworkers HW a Lieutenant, KB a Lieutenant, SH, a Lieutenant, and MB a sergeant and Plaintiff's first level supervisor.

16.     From February 2016 through about May 2016, when Ms. Washington was on Midnights, Officer HW was assigned to give her Familiarization Training, (which was an

3

informal training that she needed to provide her with updates for her returning to patrol), for approximately one month from February to March 2016.

17.     During this time, he made sexual advances towards her, including flashing a wad of money at her thereby insulting her by indicating that he wanted to buy sexual favors from her.

18.     This incident as witnessed by MB, her supervisor

19.     MB was able to witness Plaintiff making clear to HW that his behavior was inappropriate and unwelcome.

20.     MB took no action towards HW to address HW's behavior or Plaintiff's concerns, but he did laugh.

21.     When MB observed the inappropriate behavior, his laughter was condoning  the inappropriate behavior as permissible and acceptable to WMATA.

22.     On a different occasion, within weeks of HW pulling out money to solicit Plaintiff for sexual favors, he next brought bottles of wine to work and again made inappropriate advances towards Plaintiff while trying to get her to drink wine and knowing that she had expressed how uncomfortable she was about his inappropriate advances.

23.     Upon information and belief, Officer Williams has not made sexual advances and offered wine to any other male employees whom he was training.

24.     On or about January 27, 2016, while on a midnight shift, Lt. SH asked Ms. Washington what color panties she had on, asked her to kiss him, and continuously attempted to coerce her to come into his office.

25.     On or about July 11, 2017, Lieutenant KB acted as if something was on Ms. Washington's buttocks and touched her in that area.

26.     In the Winter months of 2017, the promoted Lieutenant MB came through Metro Center Metro Station and hugged Ms. Washington for an extended period of time and whispered in her ear, "You are sexy as shit and you smell so good."

27.     In the Summer of 2017, SH was on a detail with Ms. Washington and she was leaning on a wall when SH's hand rested on her behind.

28.     Ms. Washington vehemently expressed her discomfort and rejection of his actions.

29.     These individuals although higher in rank than Ms. Washington, did not directly supervise her.

30.     During the Summer of 2018, Ms. Washington complained to Luis McSween in Employee Relations about the sexual harassment.

31.     Mr. McSween told her he was meeting with multiple departments about her sexual harassment complaints but Ms. Washington never received a response from him about her complaints.

### Retaliation

32.     Because Ms. Washington rejected Officer Williams' advances, he retaliated against her by not speaking to Ms. Washington  any longer and he and told Sergeant Vernon Clayton that Ms. Washington did not properly back up Officer Alexander Tax in a call for service for which she was the primary officer.

33.     Sergeant Clayton works in the Office of Professional Responsibility and Investigations (OPRI), which is the equivalent of Internal Affairs.

34.     Consequently, in May or June 2016, because of Officer William's complaint, Sergeant Clayton initiated an investigation of Ms. Washington.

35.     The allegation was investigated, but Officer Williams never submitted a written statement for the investigation and his allegation was proven to be false.

36.     Upon information and belief, Officer Williams faced no disciplinary action for making his false statements that caused an unnecessary investigation of Ms. Washington.

37.     Upon information and belief, Officer Williams has not complained of and/or accused any male officer, with no disability, no prior EEO activity and outside of Ms. Washington's race of not properly backing up an officer, causing an investigation in which he did not participate.

**Interference with use of Family Medical Leave act (FMLA)**

38.     Plaintiff was entitled to family medical leave based upon her positon at WMATA during the period of November 30, 2017 through May 30, 2018.

39.     On or about September 24, 2016, management interfered with Ms. Washington's right to Family Medical Leave Act ("FMLA") privileges.

40.     On or about August 6, 2016, while she was out on approved FMLA, Ms. Washington was charged Absence With Out Leave ("AWOL") for not attending a volunteer fair assignment.

41.     Upon information and belief, Chief Ronald Pavlik had Lieutenant Wigglesworth investigate Ms. Washington's claim of FMLA because Pavlik accused her of not having FMLA.

42.      Lieutenant Wigglesworth admitted to Ms. Washington that he had Ms. Washington's approved FMLA paperwork in his hand but Chief Pavlik still wanted a statement from her verifying that she was on FMLA.

43.     Ms. Washington, therefore, had to provide her written statement while she was ill.

44.     In another incident, on January 3, 2018, Ms. Washington returned from sick leave and Sergeant Salicia Belton told her to get a Return To Duty slip.

45.     Prior to her return to duty, she went to Occupational Health and Wellness (OHAW) to get cleared for duty, but she forgot to get the slip.

46.     Lieutenant Deveaux instructed her to return to the district until they receive a copy of the Return to Duty Slip.

47.     Per the Sergeant, Lieutenant Deveaux made Ms. Washington sit at the District for hours because he accused Ms. Washington of lying about going to OHAW to get cleared for duty.

48.     While she waited, Ms. Washington accessed her email and informed her entire chain of command of her intent to file for FMLA due to harassment she was receiving for using leave for work related illness.

49.     Jessie McClain, EAP Counselor, emailed Ms. Washington's Return to Duty Slip from OHAW, and she went to work.

50.     Because of Lt. Deveaux's questioning of her leave, on or about January 4th, Ms. Washington emailed Ron Smith, FMLA Specialist, about what occurred on the 3rd to find out if her sick leave was protected.

51.     On or about January 8, 2018, Ms. Washington had a telephone conversation with Ron Smith and they discussed how she had "articulated a need for FMLA" to him back in December 2017.

52.     Mr. Smith informed her that, due to the unforeseen circumstances of her healthcare provider being out of the country, which resulted in Ms. Washington's inability to complete and turn her FMLA paperwork, Ms. Washington had still "articulated her need for FMLA."

53.     Mr. Smith informed Ms. Washington that because of this "articulation," the leave that she was taking to date would be covered by FMLA.

54.     On or about January 11, 2018, Sergeant Young had Ms. Washington sign a memorandum informing her that Lt. Deveaux had conducted an "audit" of her current leave balances, despite knowing that she was covered by FMLA.

55.     Sergeant Young informed Ms. Washington that if she called in sick the following week Lt. Deveaux was going to start an investigation about her use of leave.

56.     On February 20, 2018, Ms. Washington turned in her FMLA packet for intermittent leave, and she received a confirmation of receipt on February 22, 2018, which she also provided to her entire chain of command.

57.     On or about August 9, 2018, Ms. Washington received an email from another FMLA Specialist indicated that her FMLA request for intermittent leave was approved and confirmed that that it covered from November 30, 2017 through May 30, 2018.

58.     Upon information and belief other officers not of Ms. Washington's race and with no EEO activity were not subject to the same scrutiny while under FMLA.

59.     On or about March 1, 2018, Fraternal Order of Police (FOP) Executive Board Member Brian Dingwall called Ms. Washington while she was out on FMLA leave and informed her that the Chief Pavlik was going to charge her with AWOL if she did not return to duty on Monday.

60.     She explained to Dingwall that she applied for FMLA and they are to treat her leave as such until otherwise notified.

61.     Despite Ms. Washington showing the receipt, from Ron Smith, FMLA Coordinator, showing that he received her packet for FMLA, she had to write Chief Pavlik an email requesting Leave With Out Pay.

62.     Upon information  and belief Janet Wong (Asian), Jennifer Taveras (white Hispani), Brian White (white), Adrean Rodriguez (white Hispanic), Amanda Dormer (white) and

others outside of Ms. Washington's race and with no protected activity filed for FMLA, were
able to use LWOP without being threatened with AWOL, and were not required by Chief Pavlik
to submit an email to requesting Leave without Pay.

**Fit for Duty Exam**

63.     Ms. Washington filed her civil case in 2016 and the complaint is on-going.

64.     She named Earl Brown and Chief Pavlik who upon information and belief are
close friends of Lt. Deveaux.

65.     From March 2018 until October 2018 when she was transferred to Records, Ms.
Washington was not working the street in the capacity of a Police Officer because she was
already working in a limited capacity with her duties as a Police Officer taken away.

66.     Nevertheless, on April 2, 2018, Rebecca Britt called Ms. Washington and told her
to report to OHAW, (also known as WMATA Medical), and only when she arrived was she told
that she was to take a Fit For Duty Exam.

67.     Ms. Washington believes that per agency policy, she should have been notified
that she was to take a fit for duty exam.

68.     When she asked Dr. Carl Johnson why she had to take this exam, he informed her
that Lieutenant Deveaux made the referral.

69.     Based on his exam, Dr. Johnson did not place any additional restrictions on her
and allowed her to go back to her limited duty work with her firearm.

70.     On April 6, 2018, Sergeant Donald Calero relieved Ms. Washington of her
firearm despite there being no such medical restriction placed on her.

71.     When she asked Sergeant Celaro why he relieved her of her firearm, Sergeant
Celaro told Ms. Washington, "I'm sorry to do this, I will be praying for you."

72.    When she asked Officer Dingwall why her firearm was taken away, he replied,

"The Chief can do whatever he wants, just be happy that you are still getting paid."

73.    Upon information and belief, no employees without EEO activity, who are

outside of Ms. Washington's race, sex, and who have no disability have been made to take a fit

for duty exam, without forewarning, or have been relieved if their firearm when no such

restrictions have been placed on them.

## Denial of Limited Duty Request

74.    On August 5, 2018, Ms. Washington submitted a request for renewal of her

limited duty request.

75.    Shortly thereafter, Chief Pavlik denied Ms. Washington's Limited Duty

application saying that limited duty was only for 100 days with no exceptions.

76.    Upon information and belief, Officer William Obrien (white mail, no EEO

activity, disability unknown) was allowed to stay on limited duty for over 100 days.

77.    In addition, upon information and belief, Officers Benjamin Stancik, (white mail,

no EEO activity, disability unknown), Zachary Welch, (white mail, no EEO activity, disability

unknown), and Michael Paigo (white mail, no EEO activity, disability unknown) have all had

their limited duty extended past 100 days.

## Hostile Work Environment

78.    On October 10, 2018, as an accommodation, Ms. Washington was reassigned to

Records Division at District 2 (Franconia Springfield).

79.    On October 26, 2018, Archie Pollard, (civilian) Manager of the Records Division,

subjected Ms. Washington to a hostile work environment when he yelled at her while she was

talking to a Lieutenant and a staff member from the Office of Emergency Management on her

personal cell phone.

80.     At the time, Ms. Washington did not have a desk phone when she came to her reassignment a Franconia Records, therefore officials and officers called her on her personal cell phone.

81.     Ms. Washington complained to Deputy Chief Warren Donald, in Administrative Services, and about Archie yelling at her, and she complained to OEEO about Mr. Pollard yelling at her.

82.     As a result of her complaining about Mr. Pollard, his behavior towards her worsened and included, but was not limited to,  yelling at her when she was on work related calls with other offices, ignoring her and refusing to speak to her about work, demeaning the work that she was doing such as keeping up her training, saying to her, "Oh I did not know you were coming back" when she returned form medical leave, and filing a complaint against her on November 26, 2018, shortly after she filed a complaint against him.

83.     Upon information and belief, Officer O'Brien (white, no prior EEO activity) worked under Pollard and was not treated the same as Ms. Washington was.  In addition Officer Taveres (white Hispanic, no EEO activity), work under Pollard too and he did not treat her the same as he did Ms. Washington.

84.     Upon information and belief, Erin Lattimore, Karen Valencia and Lt. Tamika Holmes filed complaints against Mr. Pollard.

85.     Upon information and belief, Mr. Lattimore and Ms. Valencia resigned due to the retaliation that Mr. Pollard subjected them to for their EEO activity, and Lt. Holmes who, upon information and belief, is still an employee in records, complains about retaliatory behavior from Mr. Pollard, due to her EEO activity.

**Denial of Reasonable Accommodation**

86.     On November 3, 2018, Ms. Washington requested an accommodation of a temporary adjustment to work hours allowing her to work in the evenings while receiving medical treatment during the day from November 5, 2018 through November 16, 2018.

87.     Yasmin Mitchell, the ADA Compliance Manager, informed Ms. Washington that Chief Pavlik denied her request on November 13, 2018, saying a supervisor needs to be on duty.

88.     Ms. Washington asserts that there is always a supervisor somewhere on duty and per the job description for MTPD Police Officer, one has to be able to work under minimal supervision.

89.     Officer Taveras (white, Hispanic, female, no disability), who worked in Records at District 2 in the evenings as an example, was able to work evenings in CID, and she worked 4 day 10 hour work weeks with Fridays, Saturdays and Sundays off.

On December 16, 2018, Ms. Washington submitted a supplemental questionnaire for an extension of an ADA Reasonable Accommodation for work related/illness.

90.     Her treating physician recommended a no duty status because of the toxic and negative environment.

91.     Yasmin Mitchell, the ADA Compliance manager, responded on January 6, 2019, informing Ms. Washington that there was no reason for her to engage in the interactive process because she assumed that Ms. Washington was requesting no duty as a continuation of FMLA.

92.     Ms. Washington's RA was effectively denied.

**Medical Disqualification**

93.     On January 31, 2019, Ms. Washington received a certified letter from Phillip Manganello, WMATA ADA Specialist, informing her that she had been disqualified as a Police Officer based on an evaluation conducted by Medical Services in December 13, 2018.

94.     On February 6, 2019, Ms. Washington asked Dr. Johnson why she was disqualified and he said that he and Dr. Amy Epsy-Smith, OHAW Director, concluded that because she could not perform her job in Records, (which was her accommodation), then she could not do her job as a Police Officer, for which she trained one year and that she performed for 17 years.

95.     Upon information and belief, Mr. Pollard reported  Ms. Washington as unable to perform her duties in records to Dr. Johnson.

96.     Ms. Washington told Dr. Johnson her job in Records was a modified duty assignment, and that she, therefore, was not given performance or productivity goals, and the supervisor, (Pollard), told her to just do as much as she could.

97.     She informed Dr. that none of her treating physicians recommended such, reminded him that she had not been examined by Dr. Johnson since April 3, 2018.

98.     Dr. Johnson informed Ms. Washington that her disqualification would be reversed.

99.      Shortly thereafter, Ms. Washington learned Dr. Johnson was terminated as a result of legal issues and his license in the District of Columbia expire in December 31, 2018.

100.    On March 19, 2019, Ms. Washington received an email from Dr. Epsy –Smith, informing Ms. Washington that her medical disqualification was related to her inability to perform the full duties of an MTPD Officer.

**Termination**

101.    While working at Records, Ms. Washington was not provided with any performance goals or evaluations.

102.    While she was at Records she performed data entry.

103.    She believes she was performing extremely with the record management system that she was using because  she worked on the focus group to help develop  the system she was using.

104.    In addition, she never had any complaints from management (Pollard) about the work she was doing.

105.    It was the medical disqualification that resulted in Ms. Washington's termination on April 5, 2019.

106.    Upon information and belief, no male officers, with no disability, no prior EEO activity, and outside of Ms. Washington's race have been subjected to the incidents that make up the disparate treatment discrimination,  harassment (sexual and nonsexual), and hostile environment that Ms. Washington was subjected to based on her race, sex, disability, retaliation.

107.    Upon information and belief, Erin Lattimore, Karen Valencia and Lt. Tamika Holmes filed complaints against Mr. Pollard.

108.    Mr. Lattimore and Ms. Valencia resigned due to the retaliation that Mr. Pollard subjected them to for their EEO activity, and Lt. Holmes who, upon information and belief, is still an employee in records, complains about retaliatory behavior from Mr. Pollard, due to her EEO activity.

**COUNT ONE**
**Sexual Harassment**
42  U.S.C. § 2000e-2(a)(1)

109.    Plaintiff incorporates all information and allegations contained in the preceding  paragraphs as if fully set forth, herein.

110.    Defendants is s "person" within the meaning of 42 U.S.C. § 1983.

111.    At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

112.    Plaintiff is a member of a protected class, as she is a female.

113.    Defendant, by and through their agents, made unwelcome and unwanted sexual advances and sexual comments to Plaintiff because of her sex.

114.    Defendant conditioned Plaintiff's receipt of job benefits on their acquiescence to those sexual advances. When Plaintiff refused to acquiesce, demonstrating that such advances and comments were unwelcome, she suffered tangible adverse employment actions.

115.    Defendant and Defendants' agents were acting in the course of and in the scope of their employment when they sexually harassed Plaintiff.

116.    The unwelcome sexual advances made by supervisors, Defendants and their agents toward Plaintiff constitute sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

117.    Defendant's conduct constitutes sex discrimination in violation of Plaintiffs' right to equal protection under the Fifth Amendment to the United States Constitution.

118.    Defendant had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have established ongoing and

pervasive sexual harassment as the custom and policy of the Agency.

119.    Defendant had notice and knowledge of unlawful conduct by Defendants and, through their failure to remedy and prevent such violations of law, have demonstrated deliberate indifference to the risk that such activity would result in constitutional violations.

120.    Defendant, implicitly or explicitly, with intent and knowledge of the foreseeable consequences, condoned, authorized, or ratified the conduct of their agents, promoted or permitted a working environment where such conduct was tolerated, condoned or encouraged, and systematically violated their own purported policies prohibiting sexual harassment in the workplace. Such actions were taken by or with the knowledge of WMATA officials. Defendant and their agents have been deliberately indifferent to the unlawful and unconstitutional activity that occurs at the Agency.

121.    Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

122.    Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

**COUNT TWO**
**Gender Discrimination**
42 U.S.C. § 2000e-2(a)(1)
(*Female*)

123.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

124.    Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

125.    Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

126.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42 U.S.C. § 1983.

127.     Plaintiff is a member of a protected class, as she is a female.

128.     Defendant discriminated against Plaintiff because of her gender in violation of Title VII, 42 U.S.C. § 2000e-(2)(a), by engaging in, tolerating or failing to prevent the gender-based harassment alleged herein and by failing to take affirmative action to correct and redress these unlawful employment practices.

129.     During Plaintiff's employment, management at WMATA subjected Plaintiff to a barrage of offensive and unwelcome comments. Plaintiff clearly indicated that the conduct was unwelcome. Plaintiff did not solicit or incite the conduct and she perceived the conduct to be offensive and/or undesirable.

130.     This conduct and other incidents of harassment described above were because of Plaintiff's gender, and Plaintiff did not see Officer Williams or others harass the male WMATA employees in the manner she was being harassed.

131.     The harassment directed at Plaintiff was either intended to cause her severe emotional distress or was perpetrated with malice or reckless indifference to the likelihood that it would cause such distress. Defendant is, therefore, liable to Plaintiff for all damages proximately resulting from the distress she has suffered relating to the conduct of Defendant.

132.     Due to Defendant's actions, Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering and such impact is on-going and permanent in nature.

133.     Plaintiff has incurred lost wages and loss of career opportunity, now and into the future, without Plaintiff contributing any negligence thereto.

**COUNT THREE**
**(Discrimination on the Basis of Race in violation of Title VII of**
**the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.)**

134.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

135.    As an African American Plaintiff is a member of a protected class.

136.    Plaintiff was subjected to an adverse action in the form of disparate treatment from Defendant's employ.

137.    The conduct and other incidents of harassment described above were because of Plaintiff's race.

138.    Defendant's foregoing unlawful adverse actions materially affected the terms, privileges and conditions of Plaintiff's employment when: management interfered with her use of FMLA, she was forced to take the Fit For Duty Exam, she was subjected to a hostile work environment, she was medically disqualified for her position and when she was terminated by Defendant.

139.    Defendant knew that Plaintiff is an African American prior to subjecting Plaintiff to the aforementioned material adverse employment actions.

140.    As described above, Plaintiff has been treated differently and subjected to different terms and conditions of employment in comparison with his Caucasian co-workers.

141.    Plaintiff's race was a determining factor in Defendant's unlawful conduct toward Plaintiff.

142.    Plaintiff's race was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

143.    The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

144.     Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her race (African American).

145.     Defendant discriminated against Plaintiff because of her race (African American) by engaging in, tolerating or failing to prevent discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

146.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, promotion and promotional opportunities, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

147.     Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

148.     Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity now and into the future, and all of the other losses stated without Plaintiff contributing in any way thereto.

## COUNT FOUR
### Retaliation Based Upon Protected Activity
42 U.S.C. § 2000e-2(a)(1)
(Reprisal)

149.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

150.     Defendants are "persons" within the meaning of 42 U.S.C. § 1983.

151.     At all times relevant to this Complaint, Defendants and their agents were acting under color of the laws, customs and usages of the District of Columbia within the meaning of 42

U.S.C. § 1983.

152.    Plaintiff has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

153.    Plaintiff complained verbally and in writing to WMATA management and officials regarding her belief that she was being subjected to sexual harassment and discriminatory conduct.

154.    Defendant subjected Plaintiff to the aforementioned adverse employment actions because of her participation and opposition to unlawful and discriminatory employment practices in violation of Title VII, Section 1983.

155.    The adverse retaliatory actions to which Plaintiff has been subjected are a direct result of Plaintiff having previously engaged in protected EEO activity.

156.    Similarly situated employees (no known prior EEO activity) were not subjected to the same, similar, or any other adverse treatment.

157.    Other employees who were similarly situated, but members of a different protected class than Plaintiff, have received different terms and conditions of employment.

158.    Defendant's unlawful conduct has created a climate of fear and intimidation for Plaintiff and other employees, which creates a chilling effect upon other employees' willingness to engage in protected activity.

159.    Defendant's unlawful conduct negatively impacted the terms, conditions, and  privileges of Plaintiff's employment.

160.    Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of her participation and opposition to Defendant's discriminatory conduct.

161.    Defendant is directly liable for the discriminatory acts or omissions of its agents,

servants, and employees while acting within the course and scope of their employment, under the  theory of *Respondeat Superior*.

162.    As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, promotion and promotional  opportunities, career opportunities, medical expenses and costs – and is entitled to all available  legal and equitable remedies.

163.    Plaintiff was humiliated, embarrassed and made to endure a great amount of pain  and suffering.

164.    Plaintiff has incurred lost wages, loss of reputation and loss of career opportunity,  now and into the future, without Plaintiff contributing any negligence thereto.

## COUNT FIVE
### Disability Discrimination, Denial of Reasonable Accommodation
42 U.S.C. § 2000e-2(a)(1)

165.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

166.    Plaintiff has a diagnosed  disability and is entitled to reasonable accommodation under the Rehabilitation Act  of 1973.

167.    The medical documentation provided by Plaintiff to Defendant established that her  medical  condition  is  disabling  and,  among other things,  affected  her  sleep, cognitive abilities, concentration, anxiety, work efficiency, and focus.

168.    Plaintiff made repeated requests to Defendant for a reasonable accommodation.

169.    Plaintiff informed her supervisors of her disability and that she needed modified hours an extension of her limited duties.

170.    Plaintiff was accommodated for a short period of time with modified hours, however, this was revoked when her supervisor caused her to be disqualified as a police officer, even though she was not even performing the duties of a police officer.  Her request for limited duty was denied.

171.    Upon information and belief, Defendant provided an accommodation to similarly situated employees (white, no known EEO activity).

172.    Defendant was unwilling to assist Plaintiff in receiving her reasonable accommodation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a.    Award compensatory damages in a fair and just amount;

b.    Damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct including for loss of promotional potential, reputation, lost wages, lost job benefits she would have received but for Defendant's unlawful conduct;

c.    Award any medical costs and expenses incurred as a result of Defendant's unlawful conduct;

d.    Award reasonable attorney fees, costs, and expenses with interest incurred for this action;

e.    Order Defendant to institute a policy and procedure to be implemented against discrimination;

f.    Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein;

g.    Supervisory training for the supervisors at issue herein;

h.      Award equitable, declaratory, and injunctive relief; and

i.      Award such other and further relief as this Honorable Court deems just and proper.

## Equitable Relief

81.     Plaintiff hereby incorporates, by reference hereto, the facts, law, and/or allegations contained within the preceding paragraphs, as fully set forth herein.

82.     Because of the actions alleged herein, the continued employment of the supervisors at issue herein without training in equal employment opportunity law, rules and regulations, clear and present dangers to the employees of Defendant and could result in further illegal actions on the part of Defendant, by and through its agents, servants, and employees.

## **JURY DEMAND**

83.     Pursuant to Fed. R. Civ. P. 38, Plaintiff demands trial by jury on all issues so triable.


October 31, 2019                              Respectfully submitted,

                                   By: */s/ Donna Williams Rucker*
                                       Donna Williams Rucker
                                       (MD Bar No. 04180)
                                       Deputy Managing Partner
                                       Tully Rinckey, PLLC
                                       815 Connecticut Ave.,
                                       N.W., Suite 720
                                       Washington, DC 20006
                                       (202) 787-1900
                                       (202) 640-2059
                                       drucker@fedattorney.com